**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**LT. COL. PATRICK SCHREIBER,**

     **Plaintiff,**

**v.**

**JAMES McCAMENT, et al.,**

     **Defendants.**

**Case No. 17-2371-DDC-JPO**

## MEMORANDUM AND ORDER

Plaintiff Lt. Col. Patrick Schreiber seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, of a decision by the United States Citizenship and Immigration Services ("USCIS") denying Mr. Schreiber's I-130 immigrant visa petition. Plaintiff has filed an "Opening Brief" (Doc. 21) that asks the court to reverse the decision denying his visa petition. Plaintiff asks the court to deem the agency's decision as arbitrary, capricious, and an abuse of discretion. He also asks the court to deem the decision a violation of the United States Constitution, the plain language of the governing statute, and the agency's own policies. After reviewing the administrative record and considering both parties' arguments, the court affirms the USCIS's decision. The court explains why, below.

## I. Background

The parties do not dispute the facts of this case, and the court summarizes those facts presented in the parties' briefing.

Plaintiff and his wife, Soo Jin Schreiber, are both United States citizens. Mrs. Schreiber's[1] brother's daughter, Hyebin, was born in South Korea in 1997. Hyebin arrived in the United States on December 15, 2012, when she was 15 years old, on a student visa. She lived with plaintiff and his wife from that point forward and attended school in Lansing, Kansas. Plaintiff and his wife adopted Hyebin, and the District Court of Leavenworth County, Kansas, issued a decree of adoption on November 17, 2014. That Court concluded that Hyebin's biological parents "freely and voluntarily" had consented to the adoption. Doc. 16 at 55. Hyebin received her Kansas birth certificate on December 14, 2017. And the United States Department of Defense issued Hyebin a military identification card.

Plaintiff alleges that USCIS officials told him that, because Hyebin was a citizen based on the adoption, he needed to file a Form N-600—an Application for a Certificate of Citizenship. Plaintiff filed the form pro se. The USCIS's Kansas City Field Office denied plaintiff's application. Plaintiff alleges that USCIS officials then directed him to file a visa petition for Hyebin—an I-130 Petition for Alien Relative. Plaintiff's I-130 visa petition asked that Hyebin be classified as an immediate relative—specifically, as a "legitimated" child—under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(b)(1)(C).[2] Doc. 16 at 137–38, 122–26 (plaintiff's arguments for classifying Hyebin as an immediate relative appear in his Memorandum of Law in Support of I-130 Petition for Legitimated Child Under INA

---

[1]  Plaintiff refers to Soo Jin Schreiber as "Mrs. Schreiber." So, out of respect for plaintiff's preference, the court adopts that naming convention in this Order.

[2]  Title 8 U.S.C. § 1101(b)(1)(C) sets out one of seven ways a person can qualify as a "child" under the INA. Specifically, it provides that a person qualifies as a "child" under the statute if she is:

> legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation[.]

101(b)(1)(C)).  USCIS issued a Notice of Intent to Deny plaintiff's visa petition because Hyebin was more than 16 years old when plaintiff and his wife adopted her.  The age cutoff to classify a person as an adopted "child" for immigration purposes is 16 years under a different provision of the INA, 8 U.S.C. § 1101(b)(1)(E).[3]  Plaintiff responded to USCIS's Notice, arguing that Hyebin should be classified as a child under the legitimation category in § 1101(b)(1)(C), instead of under the adoption category in § 1101(b)(1)(E).

USCIS denied plaintiff's I-130 visa petition.  Plaintiff argues that USCIS made the decision "without any analysis or consideration as to the applicability of § 1101(b)(1)(C)" to the petition.  Doc. 21 at 10.  Plaintiff then timely appealed USCIS's decision to the Board of Immigration Appeals ("BIA").  He again argued that Hyebin should be classified as a "legitimated" child under § 1101(b)(1)(C).

The BIA dismissed plaintiff's appeal.  The BIA concluded that the adoption provision categorizing a person as a "child" in § 1101(b)(1)(E) could not apply to Hyebin because her adoption was finalized after she already had turned 16.  The BIA also determined that Hyebin could not be categorized as a child under § 1101(b)(1)(C)'s legitimation provision because plaintiff had not established that Hyebin is his biological child.  The BIA cited *Matter of Bueno*, 21 I. & N. Dec. 1029 (BIA 1997), where the BIA held that, "to qualify as the legitimated child of

---

[3]  Title 8 U.S.C. § 1101(b)(1)(E) provides that a person qualifies as a "child" under the statute if she has been:

> (i) . . . adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years or if the child has been battered or subject to extreme cruelty by the adopting parent or by a family member of the adopting parent residing in the same household:  *Provided*, [t]hat no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or (ii) subject to the same proviso as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (F)(i); (II) was adopted by the adoptive parent or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child was adopted while under the age of 18 years[.]

the petitioner under section 101(b)(1)(C) of the [Immigration and Nationality Act], the beneficiary must be the biological child of the petitioner." Doc. 16 at 68. The BIA noted plaintiff did not argue that he is Hyebin's biological father. The BIA also explained that it had considered the amicus curiae's arguments.[4] Specifically, they had argued that Kansas law recognized adoption as an avenue to establish paternity, but the BIA did not use those arguments as grounds for its decision. Finally, the BIA concluded that it did not have jurisdiction to "rule on the constitutionality of the laws it administers." *Id.* (citing *Matter of Fuentes-Campos*, 21 I. & N. Dec. 905, 912 (BIA 1997)).

Plaintiff now argues that the BIA "denied the appeal without any real analysis." Doc. 21 at 10 (referencing the BIA's "short" and "terse[]" four-paragraph opinion). Plaintiff also asserts that neither USCIS nor the BIA has alleged that plaintiff's visa petition or family relationships are fraudulent. Instead, plaintiff contends in this appeal that he has "no category under which to petition for [the citizenship of] his daughter." Doc. 21 at 10–11.

## II.     Standard and Scope of Review

Plaintiff's "Opening Brief" (Doc. 21) seeks review under the APA of the BIA's decision denying plaintiff's I-130 visa petition for his daughter. He raises both statutory and constitutional arguments. The APA grants federal courts authority to review agency decisions. *See* 5 U.S.C. § 702. And the APA recognizes that this court properly can evaluate "agency

---

[4]    The Washburn Law Clinic and the Children and Family Law Center filed a brief as amicus curiae on March 27, 2017. Doc. 16 at 80–91. They argued that Kansas law recognizes adoption as one way to establish paternity. They also asserted that Kansas law has moved away from using language such as "legitimate" and "illegitimate" to describe a child's relationship to her parents. Instead, they contended, Kansas law recently has tended to use language describing children's paternity, and the Supreme Court of Kansas has defined adoption as a method of legitimation. Doc. 16 at 85 (citing *Aslin v. Seamon*, 587 P.2d 875, 877 (Kan. 1978)). They also argued that there is no biological prerequisite to establishing a parental relationship, and that adoption is simply one way to do so. They thus concluded that Hyebin should be classified as a "legitimated" child because her adoption established such a parent-child relationship. Finally, they asserted that the USCIS decision in this case violated plaintiff's equal protection rights under the United States Constitution because it treated parentage established by legitimation and parentage established by adoption differently.

action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Indeed, the APA provides that a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 706(2)(A); *see also Kobach v. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014) (citations omitted). When a court applies the "arbitrary and capricious" standard of review under the APA, it "must 'ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.'" *Kobach*, 772 F.3d at 1197 (quoting *Aviva Life & Annuity Co. v. FDIC*, 654 F.3d 1129, 1131 (10th Cir. 2011)).

The Supreme Court describes the scope of review under this standard as a "narrow" one, and it cautions that a court must not "substitute its judgment for that of the agency." *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (citations and internal quotation marks omitted); *see also Kobach*, 772 F.3d at 1197 ("This [arbitrary and capricious] standard of review is very deferential to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it." (citations and internal quotation marks omitted)).

Despite this deferential standard, a court's review still plays an important role by "ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 132 S. Ct. at 483–84. This standard requires a court to "assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 484 (citations and internal quotation marks omitted). Also, the court must determine whether the agency supported its determination with "substantial evidence." *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (internal quotations

omitted).  Substantial evidence requires "more than a scintilla but less than a preponderance of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the [agency's] findings from being supported by substantial evidence."  *Id.*  In particular, there is a "limited scope of judicial inquiry into immigration legislation."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (discussing judicial review of the INA).  Judicial review of agency action must be based on the "whole record or those parts of it cited by a party."  5 U.S.C. § 706; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (determining that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based").

## III.    Analysis

Plaintiff argues, first, that the plain meaning of 8 U.S.C. § 1101(b)(1)(C) is unambiguous and that the court should not give any deference to the agency's determination under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  He makes several arguments why there is no prerequisite biological relationship for a child to become "legitimated" under § 1101(b)(1)(C).  Second, plaintiff contends that the USCIS's denial of his visa petition violates two constitutional provisions:  the Fifth Amendment and the Tenth Amendment.  After summarizing the parties' arguments, the court addresses them in the sections below.

Plaintiff asserts that defendants "insistently shoehorned" his visa petition on his daughter's behalf into the adoption provision of the INA (§ 1101(b)(1)(E)).  He argues that each statutory subsection defining the ways a person can be classified as a "child" present alternatives to one another.  Plaintiff thus asserts that defendants should have considered his application under the provision he identified in his visa petition:  the provision about legitimated children,

§ 1101(b)(1)(C). The plain language of § 1101(b)(1)(C), plaintiff contends, is not ambiguous—

and thus deserves no *Chevron* deference because, "if Congress's intent is clear, . . . the court

must give effect to that intent." Doc. 28 at 9 (citing *Heaven v. Gonzales*, 473 F.3d 167, 175 (5th

Cir. 2006).

> Section 1101(b)(1)(C) defines a person as a "child" if she is

>> legitimated under the law of the child's residence or domicile, or under the law of
>> the father's residence or domicile, whether in or outside the United States, if such
>> legitimation takes place before the child reaches the age of eighteen years and the
>> child is in the legal custody of the legitimating parent or parents at the time of such
>> legitimation[.]

*Id.* Plaintiff looks to surrounding statutory provisions such as § 1101(b)(1)(A), § 1101(b)(1)(B),

and § 1101(b)(1)(D), which provide other INA definitions for the term "child." These other

provisions use words such as "in wedlock," "out of wedlock," "natural mother," and "natural

father." The plain meaning of the language in §§ 1101(b)(1)(A), 1101(b)(1)(B), and

1101(b)(1)(D), plaintiff argues, shows that a "genetic link" is required. But, he notes, the plain

meaning of § 1101(b)(1)(C) does not contain this language. Docs. 21 at 15, 28 at 3.

Also, plaintiff argues "'[l]egitimacy is a legal concept'" that "state or foreign entit[ies]"

govern. Doc. 21 at 16 (first quoting *Iracheta v. Holder*, 730 F.3d 419, 424 (5th Cir. 2013)).

Under Kansas law, plaintiff notes, "legitimation has long been accomplished in one of three

ways, 'includ[ing] . . . *adoption pursuant to K.S.A. 59-2103*.'" Doc. 21 at 18 (quoting *Aslin v.

Seamon*, 587 P.2d 875, 877 (Kan. 1978)). Because Kansas law recognizes adoption as a form of

"creat[ing] a parent-child relationship that cannot be undone," plaintiff argues that this state law

definition should control whether Hyebin can be classified as a "legitimated" child under

§ 1101(b)(1)(C).  Doc. 21 at 19.  Plaintiff thus asserts that defendants erroneously required a direct biological link between the parent and child at issue before that child's visa petition can qualify under the legitimation provision of § 1101(b)(1)(C).

In his Reply Brief, plaintiff also argues that the agency's action is not entitled to *Chevron* deference.  First, plaintiff asserts that the BIA "started and ended with the idea that only 'illegitimate' children could be 'legitimated,'" a proposition, plaintiff argues, that "arbitrarily limited the plain language of the statute."  Doc. 28 at 10.  Second, plaintiff asserts that, because Congress did not "charge[] the [BIA] with interpreting state legitimating procedures"—and because state law purportedly controls the definition of legitimation—the court should give no *Chevron* deference to the agency's decision.  *Id.* (citing *Efagene v. Holder*, 642 F.3d 918, 921 (10th Cir. 2011)).

Next, plaintiff discusses the concept of Assisted Reproductive Technology (ART).  Plaintiff notes that the agency, in October 2014, began to recognize that a gestational mother carrying a child to whom she does not have a biological connection can be considered "the 'natural mother' of a child born out of wedlock . . . if she is the legal parent at the time of birth."  Doc. 21 at 18 (quoting *Effect of Assisted Reproductive Technology (ART) on Immigration and Acquisition of Citizenship Under the Immigration and Nationality Act (INA)*, U.S. Citizenship & Immigration Servs. 1 (Oct. 28, 2014), https://www.uscis.gov/policymanual/Updates/20141028-ART.pdf).  Plaintiff argues that, in the context of ART, the agency recognizes non-genetic relationships for purposes of legitimation under § 1101(b)(1)(C), and so it also must recognize non-genetic adoptive parents like plaintiff.  These non-genetic gestational mothers, he says, "may be required to take action after the birth of the child to formalize the legal relationship"—a step he compares to formalizing an adoption after a child is born.  Doc. 21 at 19.  Finally,

plaintiff argues that past BIA decisions requiring a biological connection as a prerequisite to legitimation are contrary to the agency's policy statements about ART. Doc. 21 at 20 (citing *In re Bueno-Almonte*, 21 I. & N. Dec. 1029 (BIA 1997)). Plaintiff specifically asserts that the agency failed to explain the difference between its position on ART and the biological prerequisite for legitimation in plaintiff's case. He argues that the agency's reasoning—or more, accurately, the absence of reasoning—constituted arbitrary and capricious action and amounted to an abuse of discretion.

Procedurally, plaintiff cites *Darby v. Cisneros*, 509 U.S. 137 (1993), claiming that the gravamen of this case only requires plaintiffs to exhaust administrative remedies mandated by statutes or regulations. Plaintiff argues that because decisions denying visa petitions do not statutorily require an appeal to the BIA—as orders of removal do, for example—plaintiff was not required to exhaust his administrative remedies before seeking judicial review. Plaintiff also contends that remand to the BIA would be futile because the BIA "already [has] shut off applicability of any other provision of 8 U.S.C. § 1101(b)(1) to the current matter [and] is unlikely to veer from that course." Doc. 28 at 13.

In sum, plaintiff argues that his interpretation of the statute aligns with congressional intent, "hold[ing] family unity, especially for families involving minor children, as paramount in the definition of 'child.'" Doc. 28 at 6–7 (citing *Matter of M-----*, 8 I. & N. Dec. 118, 119 (BIA 1958). Plaintiff asserts that his interpretation of § 1101(b)(1)(C) protects "[t]he narrow classification of children who are legitimated by adoption, but who fall outside of section 1101(b)(1)(E) due to age . . . so long as they were under 18 at the time of legitimation." Doc. 28 at 7.

Defendants argue that the agency's interpretation deserves *Chevron* deference. Defendants first assert that § 1101(b)(1)(C) is "silent regarding the definition of legitimation and whether legitimation requires an immediate biological connection between the legitimating parent and the child." Doc. 27 at 19. Next, defendants cite *Matter of Bueno*, 21 I. & N. Dec. 1029 (BIA 1997), contending that they reasonably interpret § 1101(b)(1)(C) by requiring a genetic, biological connection between the parent submitting the visa petition and the child in question. Defendants argue that this interpretation was reasonable because the BIA evaluated our Circuit's usage of that term as well as the BIA's prior application. *Matter of Bueno*, 21 I. & N. Dec. 1029, 1032 n.1. Since Hyebin is not plaintiff's biological child, defendants contend, the BIA properly applied *Bueno* to the facts of this case.

Also, defendants assert that the court should not even evaluate two of plaintiff's arguments. Defendants first argue that the court should not consider plaintiff's argument that Kansas law defines whether Hyebin is a legitimated child for the purposes of § 1101(b)(1)(C). They note that the court only may "'judge the propriety of [the agency's] action solely by the grounds invoked by the agency,'" and "[i]f the [c]ourt cannot affirm or deny the [agency's] decision on their stated grounds, then remand is appropriate." Doc. 27 at 25 (first quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). But, even if the court should decide that Kansas law includes adoption as a method of legitimation, defendants say federal law controls the issue. Defendants contend that the agency's determination does not disturb the Kansas court's adoption decree. Instead, the agency merely decided whether that decree "met the requirements to constitute legitimation, for immigration purposes." Doc. 27 at 26. And "Congress could not establish a uniform rule of naturalization if a state court could modify Congress's mandates on

qualification." Doc. 27 at 27. Defendants thus argue that federal law controls the definition of legitimation.

Second, defendants assert that the court should not consider plaintiff's ART arguments because plaintiff did not exhaust the administrative agency's consideration of these arguments. Defendants argue that plaintiff only "mention[ed] ART in passing before the BIA, . . . [and] this two sentence footnote did not present the claim 'in sufficient detail to allow the agency to rectify' Plaintiff's perceived inconsistency between *Bueno* and USCIS's policy regarding ART." Doc. 27 at 21 (quoting *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 430–31, 431 n.6 (10th Cir. 2011)).

In the sections below, the court first addresses the parties' competing statutory interpretation and deference arguments. Next, the court discusses plaintiff's constitutional arguments and assesses whether it can consider plaintiff's argument about ART and his argument that state law controls the definition of legitimation.

## A. Statutory Interpretation of 8 U.S.C. § 1101(b)(1)(C)

To determine whether the agency's determination in plaintiff's case merits deference, the court first must consider whether the statute at issue is ambiguous. *See Efagene v. Holder*, 642 F.3d 918, 920 (10th Cir. 2011) (citing *Chevron*, 467 U.S. 837, and *Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010)). The court "is the final authority on issues of statutory construction and [it] must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. The court must use "traditional tools of statutory construction [to] ascertain[] that Congress had an intention on the precise question at issue." *Id.* If Congress has an "unambiguously expressed intent," then "that is the end of the matter; for the court, as well as the agency, must give effect" to that intent. *Id.* at 842–43; *see also Epic Sys.*

*Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) ("Where . . . the canons [of statutory construction] supply an answer, '*Chevron* leaves the stage.'"). Our Circuit has identified the statutory interpretation tools courts should employ before determining whether *Chevron* deference is appropriate. *Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016). They include: "'examination of the statute's text, structure, purpose, history, and relationship to other statutes.'" *Id.* (quoting *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004)).

As a threshold matter, the parties disagree whether the legitimation provision in § 1101(b)(1)(C) is ambiguous. The court thus begins its analysis of interpreting § 1101(b)(1)(C) by using the tools described above. For reasons explained in the next paragraphs, the court ultimately concludes that this provision is not ambiguous.

Though few courts have interpreted "legitimation" under § 1101(b)(1)(C), the court finds *De Los Santos v. INS*, 525 F. Supp. 655 (S.D.N.Y. 1981), *aff'd*, 690 F.2d 56 (2d Cir. 1982), particularly instructive. In that case, the plaintiff sought judicial review of a decision by the Immigration and Naturalization Service ("INS")—USCIS's predecessor agency—that denied a visa petition for his son because, INS concluded, his son did not qualify as a "legitimated" child under the INA. *De Los Santos*, 525 F. Supp. at 657. The text of § 1101(b)(1)(C) applied by *De Los Santos* remains the same as it did in 1981, when that case began:

> [A child must have been] legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

*Id.* Though the district court's opinion in *De Los Santos* considered a different statutory interpretation question, it nonetheless provided a comprehensive overview of the INA's

legislative history and related statutes that is germane to the court's analysis here. Below, the court applies each of the canons of statutory construction and relies on contextual information about the INA taken from the district court's *De Los Santos* opinion to help resolve the statutory interpretation question in this case.

First, the court must look to the "language of the statute itself" and consider its text and structure. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The court must give the words "their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Because the word "legitimate" functions as a verb in § 1101(b)(1), the court first considers the definitions for "legitimate" as a verb in the most current version of Merriam-Webster's Dictionary. This source defines "legitimate" as "to make (someone or something) legitimate: (1) to give legal status or authorization to; (2) to show or affirm to be justified; (3) to lend authority or respectability to." *Legitimate*, *The Merriam-Webster Dictionary* (2016). This dictionary also defines "legitimate" to mean, "to give (a child born out of wedlock) the same legal status as a child born in wedlock." *Id.* As an adjective, the dictionary first defines "legitimate" as "lawfully begotten," "specifically: born in wedlock," and "having full filial rights and obligations by birth." *Id.* Black's Law Dictionary is similar. It defines the adjective form of "legitimate" as "[b]orn of legally married parents." *Legitimate*, *Black's Law Dictionary* (10th ed. 2014); *see also Scales v. INS*, 232 F.3d 1159, 1164 (9th Cir. 2000) (concluding that, under a plain reading of the INA, "[a] 'legitimate' child is one '[b]orn of legally married parents,' or 'born or begotten in lawful wedlock or legitimized by the parents' later marriage,'" and noting that "[t]he INA does expressly require a blood relationship between a person claiming citizenship and a citizen father, if the person is born out of wedlock" (quoting *Black's Law Dictionary* 912, 232 (7th ed. 1999))).

The court recognizes that one definition of "legitimate" merely means that a person (or thing) has achieved "legal status" or "authorization"—and never refers to a biological relationship. But several other definitions contemplate "lawful[]" birth, birth "in wedlock," birth "of legally married parents," and "obligations by birth." To qualify as a "child," the statute requires that a person must be "legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile." 8 U.S.C. § 1101(b)(1)(C). The court thus concludes that, in the context of this statute, several—but not all—definitions of the operative word "legitimate" assume a biological connection between a parent and a legitimate child. The court is "impel[led] . . . toward" the conclusion that the "ordinary, contemporary, common meaning" of "legitimate," overall, ascribes a biological relationship by birth to this term. *De Los Santos v. INS*, 525 F. Supp. at 661. Also, the statute's text places the word "legitimated" before the words, "under the law of the child's residence or domicile, or under the law of the father's residence or domicile." 8 U.S.C. § 1101(b)(1)(C). The plain meaning of most definitions of the word "legitimate" suggests that a biological connection is required, and that the law of the child or father's domicile alone does not supply the definition.

But the court's analysis does not end with the text and structure of the statute. As the Supreme Court and *De Los Santos* have held, "ascertainment of the meaning apparent on the face of a statute should not end a court's inquiry." *De Los Santos*, 525 F. Supp. at 661 (citing *Watt v. Alaska*, 451 U.S. 259, 265–66 (1981)). The court thus proceeds to the second canon of statutory construction our Circuit has identified: the statute's legislative history. *See Am. Fed'n of Gov't Emps.*, 836 F.3d at 1295.

*De Los Santos* and the parties here note that Congress first incorporated language about "legitimated" children into the INA in 1952. Docs. 21 at 2, 27 at 12; *De Los Santos*, 525 F.

Supp. at 665.  The congressional reports, hearing transcripts, and floor debate about the INA

include no analysis of § 1101(b)(1)(C).  *See De Los Santos*, 525 F. Supp. at 664–65 (citing H.R.

Rep. No. 1365 (1952); S. Rep. No. 1137 (1952); H.R. Rep. No. 2096 (1952) (Conf. Rep.);

*Revision of Immigration, Naturalization, and Nationality Laws:  Joint Hearings on S. 716, H.R.*

*2379, and H.R. 2816 Before the Subcomms. of the Comms. on the Judiciary*, 82d Cong. (1951)).

But *De Los Santos* provides historical regulations and recommendations discussing whether

"illegitimate children should be deemed 'children' for the purposes of the United States

immigration laws."  *Id.* at 664–65.

In 1946, six years before the INA's enactment, the State Department had discussed

"illegitimate children" and "legitimated child[ren]" in the immigration context in this regulation:

> *Illegitimate children.*  A petition for nonquota status for an illegitimate child who
> is an alien may be filed with the Department of Justice when the petition is executed
> by the mother, if she is a citizen of the United States, or by the father, if he has
> subsequently married the mother of the illegitimate child and thereby conferred on
> the child the rights of legitimacy or has legitimated the child under the law of his
> domicil, and if he is an American citizen.

Nonquota Immigrants, 11 Fed. Reg. 8,919 § 61.209 (Aug. 17, 1946); *see also De Los Santos*,

525 F. Supp. at 664.  In 1947, one year after the State Department published its regulations, the

Senate's Judiciary Committee "conduct[ed] an investigation of and submit[ted]

recommendations concerning the immigration and nationality laws of the United States."  *De Los*

*Santos*, 525 F. Supp. at 665.  "Many of the report's recommendations were carried over into the

legislation that was ultimately enacted as the INA."  *Id.* (citing 98 Cong. Rec. 5088–89 (1952)).

These recommendations included the language from the State Department's discussion of

"illegitimate children['s] . . . 'petition[s] for nonquota status.'"  *Id.* at 664 (quoting 11 Fed. Reg.

8,919 § 61.209).  They also incorporated language similar to the current text of § 1101(b)(1)(C),

namely:  children could be "'legitimated under the law of either the child's or the father's

residence or domicile (and) if the legitimation takes place before the child reaches the age of 16 and while in the legal custody of the legitimating parent.'" *Id.* (quoting S. Rep. No. 1515, at 468 (1950)).

Though the legislative history of the word "legitimated" is limited, what is available supports the conclusion that a biological link between the parents and "legitimated" children is a requisite. The presumption that a child first must be "illegitimate" to become "legitimated" appears to have begun with the language used by the State Department regulation's language. 11 Fed. Reg. at 8,919 § 61.209; *see also De Los Santos*, 525 F. Supp. at 664. The plain reading of that regulation provides that the biological father of an "illegitimate" child could initiate a petition for nonquota status if he "legitimated the child under the law of his domicil," provided he met other requirements. *Id.* The Judiciary Committee does not appear to have changed the regulation's language when the Committee referenced the regulation again in its 1947 recommendations. Finally, since the INA's enactment in 1952, Congress has not changed the language of § 1101(b)(1)(C) substantially. The court thus determines that the "legitimation" language in § 1101(b)(1)(C) is rooted in a biological connection between a parent and his child for the purposes of visa petitions.

Next, the court considers the purpose of the statute. *See Am. Fed'n of Gov't Emps.*, 836 F.3d at 1295; *De Los Santos*, 525 F. Supp. at 669 (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 608 (1979)). As our Circuit has emphasized, courts "'must guard against interpretations that might defeat [the] statute's purpose[.]" *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1149 (10th Cir. 2004) (quoting *United States v. Soto-Ornelas*, 312 F.3d 1167, 1172 (10th Cir. 2002)).

Congress recognized "the desirability of maintaining or fostering the unity of immigrant families" when it created "preferential immigration classifications" such as those favoring children. *De Los Santos*, 525 F. Supp. at 669 (citing S. Rep. No. 1515 (1950)). Plaintiff also argues that the court should consider this same "[c]ongressional decree of family unity." Doc. 21 at 17. "[I]nterpreting 'legitimated' in accord with its plain meaning" to include a biological connection "inevitably prevents unification of some immigrant families." *De Los Santos*, 525 F. Supp. at 669. Plaintiff notes that there is a "narrow classification of children who are legitimated by adoption, but who fall outside of section 1101(b)(1)(E) due to age." Doc. 28 at 7. If the court interprets § 1101(b)(1)(C) to require a biological relationship, it recognizes that the statute will not cover this "narrow classification of children." The court acknowledges that the statute thus will not achieve at least one congressional goal—family unity for these children.

But the statute's failure to satisfy a legislative goal for a particular group does not end the court's inquiry. The court's capacity to review the agency's interpretation of a statute is limited. *De Los Santos*, 690 F.2d 56, 60 (2d Cir. 1982) (citing *Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 153 (1946)). "It is not the province of the courts to insist that [the agency's] interpretations of [the INA] result in the perfect immigration scheme, or even that they be the best interpretations possible." *Id.*; *see also Rochester Tel. Corp. v. United States*, 307 U.S. 125, 146 (1939) ("The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." (internal quotations omitted)). Here, the agency's interpretation requiring a biological relationship between plaintiff and his daughter aligns with the INA's plain language and its legislative history. Even though this interpretation will exclude the category of children that plaintiff identifies, it is not irrational or contrary to the construction or history of the statute. It's just the opposite. The plain meaning and statutory

history support the agency's interpretation that § 1101(b)(1)(C) requires a biological relationship between a visa petitioner and his "legitimated" child. The court thus concludes that the agency's interpretation does not "defeat [the] statute's purpose[.]" *Harbert*, 391 F.3d at 1149.

Finally, the court considers § 1101(b)(1)(C)'s relationship to other statutes. *See Am. Fed'n of Gov't Emps.*, 836 F.3d at 1295; *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (noting that "[t]he similarity of language in [two statutes] is, of course, a strong indication that the two statutes should be interpreted *pari passu*"). *De Los Santos* evaluated the Nationality Act of 1940, and its analysis illuminates how past statutes with similar language have treated "illegitimate" and "legitimate" children. The Nationality Act included "[t]he first provisions in the United States nationality laws that dealt with illegitimate children." 525 F. Supp. at 665 (noting that the INA consolidated federal immigration and nationality law). The Nationality Act allowed "illegitimate child[ren] of United States citizens [to] be eligible for United States citizenship if th[ose] child[ren] had been 'legitimated' under the law of his or her domicile and if the 'legitimation' occurred when the child was in the legal custody of the legitimating parent." *Id.* at 667. As *De Los Santos* notes, congressional reports about the Nationality Act do not discuss Congress's intent for the terms "illegitimate" and "legitimate." But *De Los Santos* does observe that "testimony during the hearings on the proposed [Nationality Act] demonstrates that Congress understood a 'legitimated' child to be a child who the law treated 'just as if it had been born legitimately.'" *Id.* (quoting *To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 Before the H. Comm. on Immigration and Naturalization*, 76th Cong. 431 (1940)).

The court reads the Nationality Act—"the body of law most closely related to United States immigration law" and the first immigration law discussing "legitimation"—to endorse an

interpretation that requires a biological connection between a legitimating parent and his child. *Id.* at 667. Also, the Nationality Act of 1940 and the INA share the language about "legitimated" and "illegitimate" children. *See id.* at 666. And the Nationality Act defined a "legitimated" child as one who would be treated as though she had been born legitimately. Like the language from the State Department's 1946 regulations, the Nationality Act presumes that the child in question was born "illegitimately," and thus must be "legitimated" later under the statute. The Nationality Act's language aligns with the legislative history and plain meaning of the word "legitimated," as it currently appears in § 1101(b)(1)(C). The court thus concludes that the text and legislative history of the Nationality Act of 1940 also support the inference that § 1101(b)(1)(C) requires a biological connection.

Having considered the plain meaning of the INA, its legislative history and purpose, and the related Nationality Act of 1940 and its use of the term "legitimated," the court concludes that § 1101(b)(1)(C) is, on balance, not ambiguous. Congress has spoken about the definition intended for the term "legitimated." And the canons of statutory interpretation persuade the court that Congress intended for the term "legitimated," in the context of § 1101(b)(1)(C), to require a biological connection between the parent and child. The court also concludes that the agency interpreted § 1101(b)(1)(C) in accordance with this plain meaning of the statute. *See Kobach*, 772 F.3d at 1197 (requiring the court to "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made"); *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (requiring agencies to support their conclusions with "substantial evidence," which is "more than a scintilla but less than a preponderance of the evidence"). Here, USCIS determined that because plaintiff lacked any biological relationship with Hyebin and the term "legitimated"

requires such a connection, Hyebin could not be categorized as a "child" under § 1101(b)(1)(C). The agency also properly determined that plaintiff had adopted Hyebin when she was over the age of 16 and thus no longer could be classified as a "child" under § 1101(b)(1)(E).

The court holds that the agency's determination about plaintiff's case was not arbitrary or capricious. The agency provided sufficient rationale for its decision based on the arguments that plaintiff presented. *See Lockheed Martin Corp. v. Admin Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1129 (10th Cir. 2013) (determining that courts must give "deference to [agency] construction of the [statute] if reasonable" and "supported by substantial evidence," meaning "such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion" (internal quotations and citations omitted)). The USCIS and BIA decisions applying 8 U.S.C. §§ 1101(b)(1)(C) and 1101(b)(1)(E) are affirmed.

### B. Constitutional Arguments

Plaintiff also makes two constitutional arguments about the agency's interpretation of § 1101(b)(1)(C). First, relying on his Assisted Reproductive Technology ("ART") argument, plaintiff asserts that the agency violated his equal protection rights under the Fifth Amendment.[5] Plaintiff contends that the agency's current policy recognizes non-genetic gestational mothers who formalize relationships with their children after birth, but not non-genetic fathers like plaintiff, who formalized his relationship with Hyebin after her birth. Plaintiff characterizes this difference as unconstitutional disparate treatment. *See* Doc. 21 at 21–22. Second, plaintiff argues that the agency's interpretation of § 1101(b)(1)(C) violates the Tenth Amendment[6]

---

[5]    In his Opening Brief, plaintiff also notes that equal protection rights are applied to state action through the Fourteenth Amendment. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). But the court summarizes plaintiff's equal protection arguments here under the Fifth Amendment because the plaintiff is challenging a federal agency's actions.

[6]    The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

because it abridges the states' traditional function as the governmental authority who defines legitimation. Requiring a biological connection between plaintiff and Hyebin, he contends, "places the State in the position of having to treat its own citizens unequally and giving different value to birth records of foreign children versus U.S. citizen children [who are] adopted in the State of Kansas." Doc. 21 at 23. The agency's interpretation, plaintiff asserts, is "coercive" and "threatens [state] sovereignty." *Id.* Plaintiff also asserts that USCIS's interpretation is contrary to other "[i]mmigration laws [that] have long recognized the validity of State court orders." Doc. 28 at 14.

Defendants respond, arguing that the court should disregard plaintiff's Tenth Amendment argument because the agency did not use Kansas law as a basis for its determination. Defendants alternatively argue that, if the court considers plaintiff's Tenth Amendment argument, "the Supremacy Clause [of Article VI of the Constitution] controls the interaction between state laws regarding family law and immigration law." Doc. 27 at 25. Defendants also contend that their interpretation of § 1101(b)(1)(C) does not disturb state-issued adoption decrees—the agency merely evaluates those decrees in light of federal immigration statutes to determine whether a child is "legitimated." Doc. 27 at 26. Defendants argue that "Congress could not establish a uniform rule of naturalization if a state court could modify Congress's mandates on qualifications for naturalization." Doc. 27 at 27.

Defendants also assert that plaintiff did not raise his Equal Protection argument—the argument based on ART—before the agency, and thus the court should not consider it in this limited review. Doc. 27 at 21. Specifically, defendants distinguish between plaintiff's claims about the constitutionality of the agency's interpretation (which the agency has jurisdiction to decide) and constitutional challenges to the statute itself (which, it says, the agency lacks

jurisdiction to hear).  Doc. 27 at 28.  Alternatively, defendants "do not concede" (Doc. 27 at 25)

that Kansas law defines adoption as a form of legitimation.  They also argue that non-genetic

gestational mothers carry and give birth to their children, which differentiates these mothers from

non-genetic adoptive parents like plaintiff.  Doc. 27 at 29–30.  The two groups, defendants

contend, are not similarly situated for purposes of equal protection analysis.  And even if the

court decides that the groups are similarly situated, defendants argue, differentiating between

them should be subject merely to rational basis review.  Doc. 27 at 30.  Defendants profess that

they easily can articulate sufficient immigration-based grounds to justify different treatment for

non-genetic gestational mothers and non-genetic adoptive fathers.  Doc. 27 at 30–32.

 In the sections below, the court first evaluates whether it can consider plaintiff's

arguments about ART and state law definitions of legitimation.  Deciding that it cannot consider

those arguments, the court then considers whether it nonetheless can consider plaintiff's

constitutional arguments now.

### 1. *Plaintiff's Arguments Based on ART and Kansas Law*

 An agency "must have [had] the opportunity to rule on a challenger's arguments before

the challenger may bring those arguments to court."  *Garcia-Carbajal v. Holder*, 625 F.3d 1233,

1237 (10th Cir. 2010).  "'A reviewing court usurps the agency's function when it sets aside the

administrative determination upon a ground not theretofore presented and deprives the [agency]

of an opportunity to consider the matter, make its ruling, and state the reasons for its action.'"

*Id.* (quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)).

Our Circuit and the Supreme Court have outlined the policy rationales for this rule:  "to avoid

premature interference with agency processes, to give the agency the opportunity to correct its

own errors, and to afford the parties the benefits of whatever expertise the agency may possess."

*Id.* (noting that the Circuit has "refuse[d] to consider arguments—sometimes very good arguments—that were not presented to the agency before being presented to [the court]").

Also, plaintiffs must have raised their claims during the administrative proceedings "in sufficient detail to allow the agency to rectify the alleged violation." *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 430 (10th Cir.) ("[T]he claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." (citing *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999))). Plaintiffs are required to "'structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'" *Id.* (quoting *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007). Because the court must consider the agency's action based on the "whole record," the court begins by closely reviewing the arguments plaintiff made in his filings with USCIS and the BIA. *See* 5 U.S.C. § 706; *Chenery Corp.*, 318 U.S. at 87.

The court turns first to plaintiff's ART arguments. The administrative record shows that plaintiff referenced ART in a footnote in his Brief in Support of Appeal from Denial of I-130 Petition for Alien Relative by United States Citizenship and Immigration Services. Doc. 16 at 32. In that footnote, plaintiff argued:

> A biological requirement, as the sole [] controlling factor has been minimized in context of legitimated children to some degree as of October 28, 2014. USCIS issued policy guidance in the USCIS Policy Manual and Adjudicator's Field Manual outlining that a non-genetic gestational mother (person who carried and gave birth to the child) who is also the child's legal mother may be recognized in the same way as genetic legal mothers are treated under the INA.

*Id.* But the record does not reflect that plaintiff made any additional argument about ART in the briefing he submitted to the agency. *See* Doc. 16 at 26–35, 122–26 (The court considered the

arguments plaintiff made to USCIS in his Memorandum of Law in Support of I-130 Petition for

Legitimated Child Under INA 101(b)(1)(C) and to the BIA in his Brief in Support of Appeal

from Denial of I-130 Petition for Alien Relative by United States Citizenship and Immigration

Services.  These portions of the agency record show the limited nature of plaintiff's arguments

before the agency.).  The lone footnote in plaintiff's Brief argued simply that the USCIS had

placed less weight on the biological connection between parents and children when it recognized

non-genetic gestational mothers under the INA.  The footnote is couched in plaintiff's arguments

about a case the Tenth Circuit had decided, *Pfeifer v. Wright*, 41 F.2d 464 (10th Cir. 1930), and

*Pfeifer*'s discussion of adoption and legitimation under Kansas law.  The principal text of

plaintiff's argument never mentions ART.

But in his Opening Brief now, plaintiff advances more complex and nuanced

constitutional arguments.  Namely, he asserts that:  (1) because the agency recognized non-

genetic relationships in the ART context, it was required to recognize plaintiff's non-genetic

relationship with his daughter for legitimation purposes; (2) because non-genetic mothers, in the

context of ART, were required to formalize their legal relationship with their children after those

children were born, the court should draw a comparison to plaintiff's formalization of the

adoption of his daughter; and (3) past BIA determinations requiring a biological connection

between parents and "legitimated" children are incompatible with the agency's policy statement

about ART.  But as the administrative record shows, plaintiff merely described the agency's

October 28, 2014, policy on ART as a trend toward "minimiz[ing]" the biological prerequisite

"in [the] context of legitimated children to some degree."  Doc. 16 at 31.

Plaintiff did not present his current arguments to the agency, and thus the agency did not

have adequate ability to consider or review them.  Merely mentioning the agency's ART

policy—which is all plaintiff did during the administrative proceedings—failed to present the detailed arguments that plaintiff raises here in his Opening Brief. He did give the agency notice of his argument that the biological requirement had been "minimized" in the ART context. But his cursory references deprived the agency of notice that: (1) plaintiff would ask the agency to treat plaintiff's relationship with his daughter in the same fashion as non-genetic mothers' relationships with their children; (2) plaintiff contended that his adoption formalization was comparable to non-genetic mothers' formalization of their relationships with their children; or (3) plaintiff would assert that the BIA's own decisions are incompatible with the agency's ART policy statement.

Plaintiff invokes *Darby v. Cisneros*, contending that it means he was not required to appeal the Director's decision to the BIA and exhaust that appellate remedy. But the court's inquiry, as described in *Garcia-Carbajal*, must ask not only whether plaintiff exhausted his remedies; instead, it also must ask whether he exhausted specific arguments. *See Garcia-Carbajal*, 625 F.3d at 1237. Plaintiff did not raise the particular ART arguments listed above in his memoranda to the agency. So, no matter how persuasive the court might find plaintiff's detailed ART arguments now, the court cannot consider them. *See id.* (noting that our Circuit has not considered the merits of arguments not presented to an agency before presenting them for judicial review).

The court also concludes that it cannot reach the question whether Kansas law includes adoption as a method of legitimation or whether the agency's interpretation of § 1101(b)(1)(C) thus abridges Kansas law. The Supreme Court has limited the court's review. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The court also must

assess whether "the grounds upon which the administrative agency acted [are] clearly disclosed and adequately sustained." *Id.* at 94. Here, neither Director Mark Hazuda, who initially denied plaintiff's I-130 visa petition, nor the BIA, on appeal, discussed whether Kansas law defines adoption as legitimation. Doc. 16 at 109–11, 67–69. On June 10, 2016, the Director denied plaintiff's I-130 petition because: (1) Hyebin was more than 16 years old when she was adopted; (2) USCIS had sent plaintiff a Notice of Intent to Deny, asking for evidence that satisfied the requirements for § 1101(b)(1)(E)'s adoption provision; and (3) Hyebin did not qualify as a "legitimated" child under § 1101(b)(1)(C) because plaintiff is not her "natural father." Doc. 16 at 109–10. On June 5, 2017, the BIA denied plaintiff's visa petition because: (1) Hyebin "had already reached the age of 16 at the time of adoption"; and (2) the BIA's decision in *Matter of Bueno*, 21 I. & N. Dec. 1029 (BIA 1997), which required that the plaintiff be the biological parent of the child in question, controlled the agency's decision. The BIA considered but declined to discuss amicus curiae's arguments about Kansas law in the rationale for its decision because *Bueno* had superseded those arguments. The BIA also ruled that it did not have jurisdiction to address plaintiff's constitutional arguments because it "does not have jurisdiction to rule on the constitutionality of the law it administers." Doc. 16 at 67–69.

The Director and the BIA clearly and adequately stated the grounds for their decisions denying plaintiff's visa petition. Neither the Director nor the BIA based their decisions on plaintiff or the amicus curiae's arguments that Kansas law defines adoption as a form of legitimation. The court thus determines that it cannot question whether Kansas law classifies adoption as a method of legitimation.

## 2.  *Jurisdiction over Plaintiff's Constitutional Arguments*

Finally, plaintiff's assertion of constitutional arguments in this appeal does not permit the court to use those arguments as a jurisdictional foothold.  The Circuit has distinguished "between constitutional applicability of legislation to particular facts and constitutionality of the legislation."  *McGrath v. Weinberger*, 541 F.2d 249, 251–52 (10th Cir. 1976) (internal quotations omitted) ("The clear language of the rule requiring exhaustion of administrative remedies before seeking judicial review does not, however, render the rule simple in application.").  *McGrath* explained, "We commit to administrative agencies the power to determine constitutional applicability, but we do not commit to administrative agencies the power to determine the constitutionality of legislation."  *Id.* (internal quotations omitted).  The Circuit has recognized that there are "further exception[s] to the [administrative exhaustion] rule" in "cases involving the presence of constitutional questions, coupled with a showing of inadequacy of the prescribed administrative relief against the background of threatened or impending irreparable injury flowing from the delay incident to pursuit of the available administrative processes."  *Id.*

Here, plaintiff raises constitutional challenges to the agency's interpretation of § 1101(b)(1)(C).  He challenges the differences between the agency's treatment of ART and its determination in his case.  He also contests the agency's interpretation of § 1101(b)(1)(C) because it allegedly usurped Kansas family law determinations.  But these constitutional challenges to the agency's interpretation of the statute—rather than to the statute itself—are "commit[ted] to administrative agencies."  *See McGrath*, 541 F.2d at 251.  Plaintiff's arguments here require an analysis of the "constitutional applicability of legislation to particular facts," but

not an assessment of the "constitutionality of the legislation" or particular provisions of the statute. *See id.*

Also, plaintiff's case does not fall under the exception that the Circuit has recognized. To be sure, plaintiff's claims here try to present constitutional issues. But none of them is "coupled with" any showing that the administrative relief he sought has produced "threatened or impending irreparable injury" because of delay. In his Reply Brief, plaintiff notes that he was not required to appeal the Director's denial of his visa petition to the BIA. Yet, plaintiff chose to appeal. Because plaintiff's appeal was a discretionary one, the court cannot conclude that plaintiff faced irreparable injury because of the time it took for him to pursue administrative remedies.

The court thus determines that the agency had jurisdiction to review those claims that plaintiff raised before it. The BIA considered arguments based on Kansas law, but it declined to discuss these arguments as grounds for its determination because of "controlling precedent" that required a biological connection between a parent and "legitimated" child. Nor can the court decide plaintiff's arguments based on ART or state law control of the definition of legitimation. Those arguments involve challenges to the agency's application of the INA to plaintiff's case, and such arguments are "commit[ted]" to the agency. *McGrath*, 541 F.2d at 251.

## IV. Conclusion

For the reasons explained, the court affirms the decisions by USCIS and the BIA in plaintiff's case and denies plaintiff's request to reverse the agency's decision. The court concludes that the provision in question, 8 U.S.C. § 1101(b)(1)(C), is not ambiguous. The statute's plain meaning requires a biological connection between a visa petitioner and his beneficiary for purposes of § 1101(b)(1)(C). The court also concludes that the agency

interpreted the statute in accordance with its plain meaning. Finally, the court determines that it cannot consider the plaintiff's constitutional challenges to the agency's interpretation of § 1101(b)(1)(C).

**IT IS THEREFORE ORDERED THAT** defendant's request in his Opening Brief (Doc. 21) to overturn the United States Citizenship and Immigration Services' and Board of Immigration Appeals' determinations in his case is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of September, 2018, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**